## FORBES V. DRISCOLL.

1. PRE-EMPTORS OF PUBLIC LANDS—COURT OF LAW—NO JURISDICTION TO TRY QUESTIONS INVOLVING RIGHT TO ENTER LANDS.

   A court of law cannot, while a contest is pending before the United States land office between rival pre-emptors, or prior to any decision of the United States land department, hear and determine a contestant's right to pre-emption, in an action to determine his right of possession of public lands, under the provisions of Sec. 650, Code Civil Procedure.

2. PUBLIC DOMAIN—PRE-EMPTION SETTLERS—NO RIGHTS EXCEPT AS TO LANDS ACTUALLY IMPROVED AND OCCUPIED.

   Government lands settled upon by pre-emptors remain a part of the public domain until final entry and payment therefor; and a pre-emptor acquires no rights outside of the lands actually settled upon and occupied by him as against other settlers upon the tract embraced in his entry.

3. SAME—POSSESSION.

   To confer any rights upon a settler under the pre-emption law, his prior possession must be actual—constructive possession is not sufficient.

4. SAME—TRESPASSERS.

   Settlers upon the same quarter section or tract of land, are trespassers only when they intrude upon the actual possession and improvements of another.

Filed February 14, 1887.

Appeal from the district court of Lawrence county.

The facts are fully stated in the opinion.

*E. W. Martin, Van Cise & Wilson,* for defendant and appellant.

*Albert Allen* and *James M. Young,* for respondent.

TRIPP, C. J. This is an action brought by the plaintiff, Forbes, to recover possession of a quarter section of government land under our statute to "determine conflicting clams to real property." The particular allegations of the complaint on which the action was tried are as follows: "That during all the time from the first day of May, 1879, up to and until and at the time of the wrongful entry thereon by the defendant, as hereinafter alleged, the plaintiff was in the lawful, actual, quiet, peaceful possession, and entitled thereto, of the following described premises, situated in Lawrence county, Dakota terri-

tory, to-wit, [then follows a description of the real property;] and that at all times since the plaintiff has been and now is entitled to the possession thereof, having on May 20, 1879, filed his declaratory statement of pre-emption in the United States land office at Deadwood, Dakota territory. (2) That heretofore, to-wit, on or about the twentieth day of January, 1880, and while the plaintiff was so as aforesaid in the lawful, actual, peaceful, quiet, and exclusive possession of said premises, and entitled thereto, the defendants wrongfully entered into and upon the same, and ousted and ejected the plaintiff therefrom, and ever since that day have wrongfully withheld the possession thereof from the plaintiff, to his damage in the sum of two thousand dollars."

No objection was made to the complaint, by demurrer or otherwise, but the defendants appeared, and answered thereto,— the defendant Foley, by general denial, and the defendant Driscoll by general denial, and by allegations of new matter as a defense. The principal allegations of defendant Driscoll's answer, after the general denial, are as follows: (2) That the defendant, George W. Forbes, has at no time made a settlement in person upon the land described in the complaint; that he has at no time inhabited or improved the said land, or made his home there, or resided thereon; that the said plaintiff has not any time erected a dwelling thereon, or purchased or owned one thereon; that, on the contrary, the said plaintiff has resided in the city of Deadwood, Lawrence county, Dakota, continuously, since the month of January, 1879, and long prior thereto, and has carried on business continuously there since that time, and that his family have resided with him at his home in the city of Deadwood, continuously, since the month of December, 1879; that the said George W. Forbes has wholly abandoned the said land long prior to the settlement and improvements thereon by the defendant under the pre-emption laws; and that the said land was wholly forfeited to the government of the United States long prior to the settlement and improvements of the defendant thereon. (3) That on the sixth

V.4DAK.—22

day of January, 1880, the defendant Frederick Driscoll, being
a single person over the age of twenty one years, and a citizen
of the United States, made a settlement in person upon the
land described in the complaint, the same being public land of
the United States subject to pre-emption; that the said defend-
ant settled peaceably upon the said land as a pre-emptor, and
filed his declaratory statement of his intention to claim the said
tract of land under the pre-emption laws of the United States,
in the United States land office at Deadwood, Dakota, on the
eighth day of January, 1880; that the said defendant estab-
lished his residence upon the said land on the sixth day of Jan-
uary, 1880, and has inhabited and cultivated and improved the
same continuously since the said dates, and erected a dwelling
house thereon in the month of January, 1880; that the said de-
fendant has built one and one half miles of substantial fencing,
with buildings and improvements on the said land, of the value
of $1,500; and has broken and is cultivating 55 acres of said
land, and has now a growing crop thereon of the value of $1,-
500.   (4) That a contest is now pending in the United States
land office, before the register and receiver, at Deadwood, Da-
kota, to determine the rights of the parties herein to the said
land, in which action the said George W. Forbes is plaintiff,
and the said Frederick Driscoll is defendant.

Upon the issues thus formed the parties proceeded to trial
to a jury, and the plaintiff, without any objection on the part
of the defendants, was permitted to offer and put in proof a
large amount of evidence tending to prove that he made settle-
ment upon the land in controversy some time in April, 1879,
and filed his declaratory statement therefor, under the pre-
emption law, on May 20, 1879; that he built a frame shanty ad-
dition to the log building then already on the premises; that
he enclosed by fence a portion of the premises, including the
log building and shanty, such inclosure being variously esti-
mated at from two to ten acres, and breaking within such in-
closure a few acres of land; that he also built some calf pens
and yards for branding cattle within such inclosure; that some
of his employes occupied the house and inclosure during a por-

tion of the summer and fall of 1879; that his wife was sick, and unable to come to the premises, but that he was there, off and on, at various times, and that he considered the premises his home, and that he possessed the statutory qualifications of a pre-emptor; that during the fall of 1879 the employes of the plaintiff removed from the premises to plaintiff's ranch on Cheyenne river, taking with him the plaintiff's stock, and that, during the plaintiff's absence from the place, the defendant Driscoll went onto the land, and built a house outside of the inclosure of plaintiff, and moved his family into it; that thereafter the plaintiff on returning to the premises, attempted to knock off some boards from the fence for the purpose of making some repairs upon his house, and that the defendant Driscoll immediately nailed the boards back upon the fence; that some words ensued between plaintiff and defendant Driscoll as to the legal rights of the parties to the premises, and thereafter this action was brought to oust the defendant from the premises.

The defendant Foley seems to have made no separate defense, nor to have made any claim to the premises, at the trial. The defendant Driscoll offered in proof a large amount of evidence tending to prove that the plaintiff never made any settlement upon the premises; that he was a ranchman and a stock-raiser, and squatted upon the premises for the summer range only, and with no intention to enter the land; that his home was in Deadwood, where he was engaged in business, and that he owned a large ranch on the Cheyenne river, to which he removed his stock in the early fall of 1879; that he was not a *bona fide* claimant of the land, and that, whatever settlement he may have made in the spring of 1879, he had wholly abandoned the same; that defendant Driscoll was a *bona fide* pre-emptor, in good faith, of the premises, and that he made settlement thereon in January, 1880, built a good and substantial dwelling, and moved his family into the same; that he did not in any manner interfere with the possessions, inclosure, or improvements of the plaintiff, and that the land upon which he built his house, and that portion of the premises occupied by him, were at that time vacant, unimproved government land; that

there was no inclosure of any portion of the said premises by Forbes, and that the attempted inclosure by him did not exceed two or three acres, and that, outside of such inclosure, the entire quarter section was unimproved and unoccupied government land; that the defendant Driscoll was a qualified preemptor, and filed his declaratory statement for the said premises on the seventh day of January, 1880, subsequent to the settlement thereon; that he never interfered in any way with the improvements of the plaintiff, except to nail on some boards which plaintiff knocked off the fence, which this defendant claimed to own; that he made no resistance to plaintiff's repairing his house, but objected to the plaintiff's using lumber from the fence to make such repairs until his right to said lumber should be determined.

The testimony in rebuttal went only to new facts offered in evidence by the defendant, tending to prove that the plaintiff was not a *bona fide* resident upon the land, and excusing the' absence of the plaintiff's family. There was no proof tending to rebut the *bona fides* of defendant Driscoll's settlement upon the land, or that the residence, settlement, and improvements of Driscoll were wholly outside of the inclosure and improvements of Forbes; and no testimony whatever that the defendant Driscoll was at the time of the bringing of this action interfering, or at any time ever had in any manner interfered with the possession or improvements of Forbes, except the testimony as to renailing on the boards which Forbes had knocked off the fence. It does not appear from the testimony who built this fence, whether Forbes or Driscoll, or whether it was there when they entered upon the premises. It only appears that both claimed the particular fence, without disclosing any facts as to the foundation of such claim.

Upon this state of facts, and these pleadings, various instructions were asked on the part of Driscoll, generally relating to pre-emption rights, abandonment, etc., all of which were refused by the court, and exceptions duly saved by the defendant. And the court, of its own motion, fully charged the jury upon the rights of the respective parties under the pre-emption

law, and stated to them the law of abandonment, as applied to pre-emption claims; to which charge by the court the defend-ant duly excepted, and presents his exceptions here. And the jury, after deliberation, found a general verdict upon all the issues in favor of the plaintiff. And after motion for a new trial, denied by the court, the plaintiff was permitted to amend his complaint to conform to the facts proved, by setting out fully the claim of the plaintiff as a pre-emptor, his qualfications, settlement, filing, residence, cultivation, etc., and the wrong-ful entry of the defendants; which application to amend was resisted by defendant, and the order permitting such amend-ment duly excepted to, and thereafter judgment for the posses-sion of the premises was duly entered in favor of the plaintiff, and against the defendants.

From this statement of this case it will be observed that the action was tried and determined ''as a pre-emption contest'' at law; and, while the complaint upon which the action was tried was silent as to the facts upon which the plaintiff based his right of possession, the answer seems to have come in and supplied this omission, and the parties, by mutual consent, seem to have en-tered upon a ''contest'' to maintain their rights in the same manner, and by the same class of testimony, they would have adduced before the local land office in their assertion of their pre-emption rights to the land; and the learned judge who pre-sided at the trial seems to have held them to their own theory of the case, up to its final determination; and, in granting the order amending the complaint so as to conform it to the facts proved, he facetiously remarks: ''It appearing to the court from the minutes of the court and the stenographer's, at the trial and the instructions of the court to the jury, that the trial of this case was had upon the theory that the complaint contained all the material allegations in the proposed amended complaint, without objection on the part of the defendants, it is or-dered,'' etc.

This question is therefore now presented to this court, (the defendant, by his motion to set aside the verdict on the ground of insufficiency of the testimony and otherwise, having prop-

erly saved the question:)   Can a court of law, while a contest is pending, or prior to any decision of the land department, hear and determine a contestant's right of pre-emption in determining his right to possession of public lands?

The plaintiff relies upon Section 650 of our Code of Civil Procedure as giving him the right to maintain this possessory action prior to issuance of the patent. That section reads as follows: "Any person settling upon the public lands belonging to the United States, on which settlement is not expressly prohibited by congress or some department of the general government, may maintain an action for any injuries done the same, also an action to recover the possession thereof, in the same manner as if he possessed a fee-simple title to said lands." Section 650, Code Civil Proc.

If any doubt before existed that, under Chapter 29 of the Code of Civil Procedure, a person entitled to the possession of real property could maintain an action to recover it, though his title were less than a fee-title, this section would seem to remove that doubt, at least so far as claimants upon the public lands are concerned; but the section nowhere, in express or fairly implied terms, seeks to give claimants the right to try their contests in the courts of law.   It was not the evident intent of the legislature to attempt to take away that right from the tribunal charged under the law of congress with the power to hear and "determine all questions as to the right of pre-emption, arising between different settlers on the public lands." Rev. St. U. S. 1851.   It was enacted, without doubt, to set at rest any question that might arise as to the right of the settler upon public lands to protect his improvements and possessions against a mere intruder or trespasser.   The pre-emption law dates back early in the history of the land department.   The necessity and wisdom of its enactments is well put by Mr. Justice MILLER in Atherton v. Fowler.   "In the earliest stages of our land system no right or interest could be secured by the individual in any public land until it had been surveyed into legal sub-divisions; nor, after this had been done, was it subject to sale until, by the proclamation of the president, it was brought into

market. This proclamation always fixed a time and place
when the lands within a given district were to be offered for
sale at public auction; and until all of them were sold which
could be sold in this manner, at prices above the minimum fixed
by law, no one could make a private entry of a particular tract,
or establish a claim to it. The scenes of violence, fraud, and
oppression, and the combinations which attend these sales, and
the wrongs perpetrated under them, led to the law of pre-
emption. It often occurred that emigration, in advance of the
readiness of the public lands for these sales, had caused hun-
dreds and thousands to settle upon them; and, when they came
to be sold at public auction, their value, enhanced by the houses,
fences, and other improvements of the settler, placed them be-
yond his reach, and they fell into the hands of heartless specu-
lators. To remedy this state of things the pre-emption system
was established." 96 U. S. 517.

The pre-emption law never sought to sever or segregate
the pre-emption claim from the public domain. It remained a
part of the public domain until the pre-emptor entered the
land by "proving up" and paying therefor at the local office.
The declaratory statement made by the pre-emptor was only a
notice of intention to claim the land so settled upon, and it con-
ferred no rights upon the settler outside of the lands actually
settled upon and occupied by him as against other settlers nor
even as to his actual occupation as against the government.
Frisbie v. Whitney, 9 Wall. 187; Yosemite Valley Case, 15
Wall. 77.

As to all portions of the premises named in the declaratory
statement not actually occupied, they were still public lands,
open to the occupation of any honest settler who desired, in
good faith, to contest the pre-emption rights of a prior settler.
Section 2273, which provides for the settling of contests be-
tween different settlers by the local land officers, also pro-
vides that, "when two or more persons settle upon the same
tract of land, the right of pre-emption shall be in him who
made the first settlement," clearly contemplates the right of
more than one pre-emptor to settle upon and claim the same

quarter section, said settlement always being made with the implied proviso that the land will eventually go to the earliest pre-emptor who, upon contest, is found to have complied with the law. Such settlers upon the same quarter section are not trespassers only when they intrude upon the actual possession and improvements of the other. This has been the interpretation given the law by the department and the courts from the earliest period of its enactment. It is also a general proposition of law that where the plaintiff's right to recover rests upon prior possession alone, that possession must be actual; a constructive possession is not sufficient. Sampson v. Sampson, 15 Cal. 93; Coryell v. Cain, 16 Cal. 567; De Graw v. Taylor, 37 Mo. 310; Fugate v. Pier & Sons, 49 Mo. 441; Walsh v. Hill, 38 Cal. 481; Thompson v. Bunson, 61 N. Y. 68; 3 Washb. Real Prop. 118, § 9; Jackson v. Warford, 7 Wend. 62.

Atherton v. Fowler, *supra*, contains nothing contrary to this rule; but the doctrine of that case, on the contrary, is in accord with the rulings of the department and the former decisions of the courts. The case is one of the many growing out of the famous "Soscol Ranch" matter. In that case a trespasser, seeking to justify under his pre-emption rights, had entered forcibly upon the prior, peaceable, actual possession of the other, by breaking through his enclosure, and forcibly ousting him of his possession, and driving him out by threats and violence. The court says: "The defendants in this case, though taking no part in the night invasion mentioned in that case, (Frisbie v. Whitney,) did, during the spring and summer of 1862 and 1863, enter upon the land in the possession of Page,—land which in every instance was inclosed within fences, and which was under actual cultivation; and this entry was without the consent, or having in any way the permission, of those in possession, but by forcibly driving them out." 96 U. S. 514. Again says the court: "Does the policy of the pre-emption law authorize a stranger to thrust these men out of their houses, seize their improvements, and settle exactly where they were settled, and by these acts acquire the initiatory right of pre-emption? The generosity by which congress gave the set-

tler the right of pre-emption was not intended to give him the benefit of another man's labor, and authorize him to turn that man and his family out of their home. It did not propose to to give its bounty to settlements obtained by violence at the expense of others. The right to make a settlement was to be exercised on unsettled land—to make improvements on unimproved land. To erect a dwelling house did not mean to seize some other man's dwelling. It had reference to vacant land,—to unimproved land; and it would have shocked the moral sense of the men who passed these laws if they had supposed that they had extended an invitation to the pioneer population to acquire inchoate rights to the public lands by trespass, by violence, by robbery, by acts leading to homicides and other crimes of less moral turpitude." 96 U. S. 519. The court in this language was answering the position taken by counsel that, in absence of some statute other than the pre-emption law itself, the lands were public lands, open to settlement, and that the settler making entry thereon by force was not a trespasser. The court did not intend to extend the doctrine announced beyond the actual possessions of the claimant; for in another part of the opinion the court, in addition to what has been already quoted as to inclosures of the land, says: "Undoubtedly there have been cases and may be cases again, where two persons, making settlement on different parts of the same quarter section of land, may present conflicting claims to the right of pre-emption of the whole quarter section, and neither of them be a trespasser upon the possession of the other, for the reason that the quarter section is open and uninclosed, and neither party interferes with the actual possession of the other. In such cases, the settlement of the latter of the two may be *bona fide*, for many reasons." 96 U. S. 516.

But if there were any doubt as to the doctrine announced in Atherton v. Fowler, *supra*, the supreme court itself has announced what was meant by the language there used. In Belk v. Meagher, Chief Justice WAITE, speaking for the court, says: "There is nothing in Atherton v. Fowler, 96 U. S. 513, to the contrary of this. In that case it was held a right of pre-emp-

tion could not be established by a forcible intrusion upon the possession of one who had already settled upon, improved, and inclosed the property. Upon that proposition the court was unanimous. We also all agree that, if a peaceable entry had been made on lands which had not been inclosed or improved, a good right might have been secured." 104 U. S. 287. And the learned judge also explains the reason of his and Judge CLIFFORD's dissent in Atherton v. Fowler, to-wit, that the facts did not show that the entry in that case was a forcible one. Here, then, in Belk v. Meagher, *supra*, we have the opinion of the unanimous court that, where the peaceable entry is made on lands not inclosed or improved. a good right is secured thereby to the pre-emptor; placing the doctrine of Atherton v. Fowler in accord with prior decisions and the practice and rulings of the department.

If, then, the settlement of the defendant Driscoll was upon unoccupied portions of the land in controversy, the plaintiff would not have the right, by virtue of his prior filing, to oust him from such possession; nor would he have the right, as a prior pre-emptor, to oust this defendant from any portion of the land filed upon, except such as he (the plaintiff) had actually settled upon or improved; and as the evidence does not show the defendant Driscoll to have been in the possession of any part of the premises which had been in the prior, actual possession of the plaintiff, the verdict should have been set aside.

But there is another view which should not be overlooked by the court in determining this case. The court below, by the apparent solicitation of the opposing counsel, entered into an investigation, and finally determined the pre-emption right of the plaintiff, Forbes, to the claim in controversy, as against the contestant. in determining the right of possession. It was the only issue raised by the pleadings, it was the only issue made by the evidence, and it was the issue determined by the verdict of the jury. The plaintiff did not seek to oust a trespasser from his house, his inclosure, and his premises. He sought to eject a junior pre-emptor from the entire claim, be-

cause he (the plaintiff) had a better right of pre-emption. Has
a court of law any jurisdiction to determine such right at all?
and can it exercise such jurisdiction pending or prior to the
determination of such question by the land department?

The power to sell and dispose of the public lands is essen-
tially of an administrative or executive character. Congress,
under its constitutional power "to dispose of and make all
needful rules and regulations respecting the territory and other
property belonging to the United States," (Const. U. S.) has
placed this executive function in the hands of a special tribunal
subject to the supervision of one of the excutive officers of the
department. The general land office was created at a very
early day in the history of the government, and the public do-
main was subdivided into land districts; and local land offices
established at about the same time; and while the general
and local land offices have been made, at different times,
adjuncts of the treasury and other departments of the gov-
ernment, and made subject, also, at different times, to the
supervision of the heads of these departments, and of
the president himself, yet the general character of the
tribunal has been the same. In 1841 the first full and com-
plete pre-emption law was enacted. Pre-emption laws
had been enacted prior thereto, for limited periods, and were
the subject of frequent change and amendments; but the act of
1841 so much enlarged the rights of pre-emption that it is re-
ferred to as "the pre-emption act." Under this law, as first
enacted, as questions as to the rights of pre-emption between
different settlers were required to be settled by the register and
receiver, subject to an appeal to the secretary of the treasury.
But the act of 1858 changed this section of 1841, and made it
substantially as now embodied in Rev. St. U, S. § 2273 provid-
ing, that "all questions as to the right of pre-emption arising
between different settlers shall be determined by the register
and receiver of the district within which the land is situated;
and appeals from the decision of the district officers, in cases of
contest for the right of pre-emption, shall be made to the com-
missioner of the general land office, whose decision shall be

final, unless appeal therefrom be taken to the secretary of the interior."

Here, under the act of 1858, was created a special tribunal to determine the right of pre-emption between contesting settlers on the public lands; and the act gives the register and receiver power, in the first instance, to determine that right, and, in case of appeal, makes the commissioner's decision final, unless appeal be taken to the secretary of the interior. Could language be plainer, or the intention of congress be more clearly expressed? This tribunal created by congress is given expressly the judicial powers to hear and finally determine all rights of pre-emption between contesting settlers on the public lands. We need not argue what might have been the powers of this tribunal, invested with the executive power of making sale of the public lands, to determine all questions of fact that might arise in the exercise of such power, under the well known rule that when an executive power is conferred, and no tribunal is designated for determining contested questions of fact arising in its exercise, the body or tribunal upon which the power is conferred is held to have such power; for congress has seen fit to confer upon the land department the express power to hear and determine all matters of pre-emption right between such settlers, and such power is necessarily exclusive. The granting the right of pre-emption to one settler determines all questions of fact upon which the granting of that right depended. Whenever a statute grants a right not before existing, and prescribes the method of obtaining or contesting that right, such method is exclusive. Dwar. St. 275 n. But we are not required to invoke this principle of law, for, whether or not this tribunal created by congress for the sale and disposition of the public lands be so far a part of the co-ordinate branch of the government as to be free from judicial control, it is very clear from the decisions of the federal courts that it is given such judgment and discretion and *quasi* judicial powers that its decisions are not open to review by the courts in a collateral attack, and its officers are free from control of the courts

to compel or restrain their action in any matter before them not purely ministerial.

Says Chief Justice TANEY in Decatur v. Paulding: "The interference of the courts with the performance of the ordinary duties of the executive departments of the government would be productive of nothing but mischief, and we are quite satisfied that such a power was never intended to be given to them." 14 Pet. 516. This language of Judge TANEY is cited with approval of the court in Gaines v. Thompson, in which it was sought to restrain the action of the secretary of the interior in directing the cancellation of Gaines' entry to certain public lands; and Judge MILLER, in referring to the powers of the officers of the land department, says: "Certain powers and duties are confided to these officers, and to them alone, and however the court may, in ascertaining the rights of parties in suits properly brought before them, pass upon the legality of their acts, after the matter has once passed from their control, there exists no power in the courts, by any of its processes, to act upon the officer so as to interfere with the exercise of that judgment while the matter is properly before him for action. The reason for this is that the law resposes this discretion in him for that occasion, and not in the courts. The doctrine is therefore as applicable to the writ of injunction as it is to a writ of *mandamus*." 7 Wall. 352.

This decision undoubtedly announces the correct rule, and the better reason why the courts refuse to interfere with the land department in the exercise of its conferred powers, though it is a familiar as it is a sound principle of law that, in acts strictly executive, and partaking of a political character, the executive department of the government is accountable only to conscience and the country; yet when the acts of an executive officer are not of such political character, but affect the private interests of individuals, they may, in a proper case, be examined by the courts of chancery.

In Johnson v. Towsley, 13 Wall. 73, the powers of the department, and the powers of the courts to review the action of

the department, is very carefully considered. The local land office had permitted Towsley to prove up on his pre-emption claim, and had issued to him the usual certificate. Johnson, a settler upon the same quarter section, contested Towsley's right of pre-emption. The commissioner affirmed the action of the local officers, and Johnson appealed to the secretary of of the interior, who reversed the action of the officers below, and directed a patent to issue to Johnson, upon the ground that Towsley had previously filed a declaratory statement for another tract of land, and that his second filing was therefore invalid. The question was solely one of law, and the secretary of the interior agreeing with the commissioner and the local officers that, upon the facts, Towsley was entitled to the patent. It was contended in the court below, in favor of Johnson, that the decision of the secretary was final, being that of a special tribunal; while an the part of Towsley it was contended that a court of chancery has power to review the action of such a tribunal in case of a misconstruction of law, of fraud or mistake preventing a hearing and determination of the case upon its merits. The supreme court, in a very elaborate and well considered opinion by Mr. Justice MILLER, goes over the whole ground as to the authority of courts to review the action of the land department, and upon that subject says: ''But while we find no support to the proposition of the counsel for the plaintiffs in error in the special provisions of the statute relied on, it is not to be denied that the argument is much stronger wher founded on the general doctrine that, when the law has confided to a special tribunal the authority to hear and determine certain matters arising in the course of its duties, the decision of that tribunal, within the scope of its authority, is conclusive upon all others. That the action of the land office in issuing a patent for any of the public lands subject to sale, by pre-emption or otherwise, is conclusive of the legal title, must be admitted under the principle above stated; and in all courts, and in all forms of judicial proceedings where this title must control, either by reason of the limited powers of the court, or the essential character of the proceeding no inquiry can be per-

mitted into the circumstances under which it was obtained. On the other hand there has always existed in the courts of equity the power in certain classes of cases to inquire into and correct mistakes, injustice, and wrong in both judicial and executive action, however solemn the form which that action may assume when it invades private rights; and by virtue of this power the final judgments of courts of law have been annulled or modified, and patents and other important instruments issuing from the crown or other executive branch of the government have been corrected or declared void, or other relief granted. No reason is perceived why the action of the land office should constitute an exception to this principle." 13 Wall. 83, 84.

It will be perceived that the court puts the jurisdiction of courts of equity upon the same ground as in case of its exercise over courts of law, or any other tribunal which has erred in its construction of the law governing it, or has been imposed upon by fraud or mistake; and, further on in the same opinion, the court announces the doctrine which has since governed and controlled the courts in the exercise of their jurisdiction over the land department: "This court has, at all times, been careful to guard itself against an invasion of the functions confided by law to other departments of the government; and, in reference to the proceeding before the officers entrusted with the charge of selling the public lands, it has frequently and firmly refused to interfere with them in the discharge of their duties, either by *mandamus* or injunction, so long as the title remained in the United States, and the matter was rightfully before its officers for decision. On the other hand it has constantly asserted the right of the proper courts to inquire, after the title had passed from the government, and the question became one of private right, whether, according to the established rules of equity and the acts of congress concerning the public lands, the party holding that title should hold absolutely as his own or as trustee for another; and we are satisfied that the relations thus established between the courts and the land department are not only founded on a just view of the duties and powers of

each, but are essential to the ends af justice, and to a sound administration of law." 13 Wall. 87.

Here is distinctly announced what jurisdiction will be exercised by the courts, and when it will exercise such jurisdiction. This is the leading case on this subject; for while the same doctrine had been before expressed in various opinions, yet the whole subject is here again reviewed. The case was elaborately discussed by eminent counsel, nnd the court itself was so impressed with the importance of the subject that the learned judge, at the beginning of the opinion, takes occasion to say: "This proposition is not a new one in this court in this class of cases, but it is maintained that none of the cases heretofore decided extend, in principle, to the one before us; and the ques tion being pressed upon our attention with an earnestness and fullness of argument which it has not perhaps before received, and with reference to statutes not heretofore considered by the court, we deem the occasion an appropriate one to re-examine the whole subject." 13 Wall. 81.

This opinion has since frequently been referred to, and the doctrine there announced has been affirmed by subsequent decisions of the court.

In Shepley *et al.* v. Cowan *et al.* the court, in refusing to review the action of the land department, by FIELD, J., says: "There is no evidence of any fraud or imposition practiced upon them, or that they erred in the construction of any law applicable to the case. It is only contended that they erred in their deduction from the proofs presented; and for errors of that kind, where parties interested had notice of the proceedings before the land department, and were permitted to contest the same, as in the present case, the courts can furnish no remedy. The officers of the land department are specially designated by law to receive, consider, and pass upon proofs presented with respect to settlement upon the public lands with a view to secure rights of pre-emption. If they err in the construction of the law applicable to any case, or if fraud is practiced upon them, or they themselves are chargable with fraudulent practices, their rulings may be reviewed and annulled by the courts, where a con-

troversy arises between private parties founded upon their decisions; but, for mere errors of judgment upon the weight of evidence in a contested case before them, the only remedy is by appeal from one officer to another of the department, and, perhaps, under special circumstances, to the president." 91 U. S. 340.

In Moore v. Robbins, on appeal to the supreme court of the United States, the secretary of the interior had entertained an appeal from the commissioner of the general land office, after the patent had issued, and had reversed the commissioner, and ordered a cancellation of the patent; and the supreme court of Illinois held the action of the secretary as final, and that the court could not exercise its chancery jurisdiction in such a case. Johnson v. Towsley, *supra*, had not then been decided by the supreme court of the United States. MILLER, J., in affirming the doctrine announced in Johnson v. Towsley, *supra*, goes further and limits the time when control over the land by the department ceases to the act of issuing the patent. That while prior to the issuing of the patent the department has power to hear and determine all questions arising as to its issue, yet, so soon as the patent has issued, the jurisdiction of the department is at an end, and the power of the courts may be invoked, in a case coming within their jurisdiction. 96 U. S. 530.

In Marquez v. Frisbie, an equitable action was brought in the state court of California, setting forth certain errors alleged to have been committed by the land officers and the secretary of the interior, whereby an order had been entered by the secretary of the interior, permitting the defendant to enter the land and praying the court to decree that the title which the defendant might obtain should inure to the plaintiff, etc. Upon demurrer to such petition the court again goes over fully the powers of the land officers, and the power of review vested in the courts. After reciting the facts stated in the complaint, the court, by Mr. Justice MILLER, says: "It plaintly appears from this— First, that defendants had not the legal title; second, that it was in the United States; third, that the matter was still

*in fieri* and under the control of the land officers. Nothing in the record of the case before us gives evidence that any further steps by the department have been taken in the case. We have repeatedly held that the courts will not interfere with the officers of the government while in the discharge of their duties in disposing of the public lands, either by injunction or by *mandamus*. Litchfield v. Register and Receiver, 9 Wall. 552. Gaines v. Thompson, 7 Wall. 347; Secretary v. McGarrahan, 9 Wall. 298. And we think it would be quite as objectionable to permit a state court, while such a question was under the consideration and within the control of the executive departments, to take jurisdiction of the case by reason of their control of the parties concerned, and render a decree, in advance of the action of the government, which would render its patents a nullity when issued. After the United States had parted with its title, and the individual had become vested with it, the equities subject to which he holds it may be enforced, but not before. Johnson v. Towsley, 13 Wall. 72; Shepley v. Cowan, 91 U. S. 330." 101 U. S. 474, 475. And the court further on quotes approvingly from decisions already referred to, as follows: "The decisions of the officers of the land department, made within the scope of their authority on questions of this kind, is, in general, conclusive everywhere, except when considered by way of appeal within that department; and that as to the facts on which this decision is based, in the absense of fraud or mistake, that decision is conclusive, even in courts of justice where the title afterwards comes in question; but that in this class of cases, as in all others, there exists in the courts of equity the jurisdiction to correct mistakes, to relieve against frauds and impositions, and in cases where it is clear that these officers have by mistake of the law given to one man the land which on the undisputed facts belonged to another, to give appropriate relief. Moore v. Robbins, *supra;* Shepley v. Cowan, *supra;* Johnson v. Towsley, *supra.*" 101 U. S. 476.

Here is distinctly and succinctly announced by the supreme court the jurisdiction that will be exercised by the courts over

the decisions of the land department, and the jurisdiction that will not be exercised; the time when it will be and the time when it will not be, exercised. The time when it will not exercise such jurisdiction is while the matter is still "*in fieri*," and prior to the time when the United States has parted with its title by the issue of the patent, and the defendant has become vested with such title. Applying the doctrines of that case to the facts in evidence in this case, and it is conclusive of it. Here the defendant alleged and offered to prove, that a contest was then pending before the local land office between the plaintiff Forbes and the defendant Driscoll, for the same land, which offer was rejected as immaterial. Perhaps, as a mere matter of fact, it was immaterial; for the mere fact as to whether a contest was or was not pending was immaterial, the jurisdiction of the court depending not upon the fact of whether a contest was or was not pending, but upon the fact of whether the jurisdiction of the department was or was not ended by the issue of the patent. Here the jurisdiction of the land department had been exercised no further than to permit the filing of the declaratory statement by each contesting claimant. The matter was yet "*in fieri*," and the decision of the court upon the issue framed by the pleadings, determining in advance of the department the pre-emption right in favor of Forbes, was an unwarranted inferferance with the jurisdiction of the land department, and was unauthorized, within the doctrine announced by this decision.

The supreme court again reiterates the same doctrine in U. S. v. Schurz, in which a *mandamus* issued to compel the delivery of the patent, which had been signed and recorded, and everything by the land department done, except the final act of delivery. The court, holding the act of delivery to be a mere ministerial act, which the officer was bound to perform, says: "Congress has also enacted a system of laws by which rights to these lands may be acquired, and the title of the government conveyed to the citizen. This court has, with a strong hand, upheld the doctrine that, so long as the legal title to these lands remained in the United States, and the proceedings for

acquiring it were as yet '*in fieri*,' the courts would not interfere to control the exercise of the power thus vested in that tribunal. To that doctrine we still adhere." 102 U. S. 396.

In Quinby v. Canlan there is a very interesting re-examination of the powers of the court to review the action of the land department, by FIELD, J., and the former doctrine, as announced in the decisions already quoted from, is not only adhered to and re-affirmed, but the court goes a step further, and says, not only was the determination of mere questions of fact by the department binding upon the courts, but also the determination of mixed questions of law and fact; and the court there says that not only must it appear that the department has been imposed upon by fraud, or that mistake has been committed, but this fact must clearly appear. "It would lead to endless litigation, and be fruitful of evil, if a supervisory power were vested in the courts over the action of the numerous officers of the land department, on mere questions of fact presented for their determination. It is only when those officers have misconstrued the law applicable to the case as established before the department, and thus have denied to parties' rights which upon a correct construction, would have been conceded to them, or where misrepresentations and fraud have been practiced necessarily affecting their judgment, that the courts can, in a proper proceeding, interfere and refuse to give effect to their action. On this subject we have repeatedly and with emphasis expressed our opinion, and the matter should be deemed settled. Johnson v. Towsley, 13 Wall. 72; Shepley v. Cowan, 91 U. S. 330; Moore v. Robbins, 96 U. S. 530. And we may also add, in this connection, that the misconstruction of the law by the officers of the department which will authorize the interference of the court must be clearly manifest, and not alleged upon possible finding of the facts from the evidence different from that reached by them." 104 U. S. 426.

In Smelting Co. v. Kemp, 104 U. S. 647, the court again asserts the doctrine of former cases.

In Steele v. Smelting Co. the defendant sought to set up his equitable interest in the land as a legal defense against the paten-

tee suing for possession, and the court, by Mr. Justice FIELD, in reiterating the doctrine so many times announced by the court, almost petulently remarks: "We have so often had occasion to speak of the land department, the object of its creation, and the powers it possesses of the alienation by patent of portions of the puclic lands, that it creates an unpleasant surprise to find that the counsel in discussing the effect to be given to the action of that department overlook our decisions on the subject. That department, as we have repeatedly said, was established to supervise the various proceedings whereby a conveyance of title from the United States to portions of the public domain is obtained, and to see that the requirements of the different acts of congress are fully complied with. Necessarily, therefore, it must consider and pass upon the qualifications of the applicant, the acts he has performed to secure the title, the nature of the land, and whether it is of the class which is open to sale. Its judgment upon these matters is that of a special tribunal, and is unassailable except by direct proceedings for its annulment or limitation. Such has been the uniform language of this court in repeated decisions." 106 U. S. 451, 1 Sup. Ct. Rep. 389.

In Baldwin v. Stark, 107 U. S. 463, 2 Sup. Ct. Rep. 473, the court held that whether the court had once exercised his preemption right was so far a question of fact that it must be admitted to have been passed upon by the department, and that such finding is final.

In the late case of U. S. v. Minor, where the supreme court lays down the doctrine that the United States may maintain an action and cancel a patent procured by perjury and upon false affidavit, the proceeding being wholly *ex parte*, no contest having been had, the United States in no manner being represented before the department, and having had no knowledge of the fraud prior to the issuing of the patent, the court, distinguishing such a proceeding from a contest between different settlers upon the public land, and re-examining the former doctrine announced by that court says: "It has been often said by this court that the land officers are a special tribunal of a *quasi* ju-

dicial character, and their decision on the facts before them is conclusive; and we are not now controverting the principle that, when a contest between individuals for the right to a patent for public lands has been brought before these officers, and both parties have been represented and had a hearing, that those parties are concluded, as to all the facts thus in issue, by the decision of the officers." 114 U. S. 243, 5 Sup. Ct. Rep. 836.

In Lee v. Johnson we have the last utterance of the supreme court, so far as their decisions have been published, upon this question. In that case the secretary of the interior had reversed the action of the commissioner upon a question which it was claimed was not in issue upon the appeal, and that the secretary's action, therefore, was original rather than appellate, and void, and the Michigan court upon that ground, had set aside his action as illegal; but the supreme court of the United States held that the matter was properly before the secretary for review, and reversed the supreme court of Michigan, and lays down the doctrine clearly that courts of law have no jurisdiction to review the decisions of the department; that such attempted review by a court of law would be collateral and void, and that courts of equity can take jurisdiction only when the right to do so is clear; and that fraud, so often referred to in the decisions, as giving jurisdiction to courts of equity, is fraud in the procurement, and not false and fraudulent testimony produced upon the hearing. Says the court: "It is only when fraud and imposition have prevented the unsuccessful party in a contest from fully presenting his case, or the officers from fully considering it, that a court will look into the evidence." 116 U. S. 49, 7 Sup. Ct. Rep. 249. And the court in such case never seeks to cancel or annul the action of the department. It never has, between contesting claimants, cancelled the patent issued, but treats the action of the government in issuing the patent as valid, and the title as passing thereby; but decrees that the title so passing shall inure to the benefit of the party entitled thereto, instead of the patentee, or in the language of the court: "The court, in such cases, merely

directs that to be done which those officers would have done if no error of law had been committed." 116 U. S. 49, 6 Sup. Ct. Rep. 249.

From these decisions of the supreme court it would seem to be settled that "courts of law" can in no case review the action of the land department after it has acted, by declaring, in effect, its acts illegal and voidable, and that courts of equity are powerless to act until the jurisdiction of the department has ceased by the issue of the patent, and that, when the jurisdiction of a court of equity is invoked, the error complained of must come clearly within one of the well-known grounds of equity jurisdiction. It follows that the plaintiff seeking to recover possession of the entire quarter section of land, upon the ground that he had the better pre-emption right, in a court of law, was a proceeding without authority, and that no judgment should be entered upon such verdict, and that a judgment so rendered would have no binding force upon the department, and would give no protection to the plaintiff, as against the future possession of the defendent Driscoll.

A contrary view of the law would bring the courts and land-offices into constant collision. A decision of the courts in advance would take from these officers the jurisdiction the law has given them to hear and determine "all rights of pre-emption arising between different settlers." It would bring into the courts for decision all claims and contests before the department, and the absurd result would be reached, as we are informed by briefs of counsel has in fact resulted in this case to-wit: That the plaintiff, Forbes, has judgment in the district court of the territory, awarding him the possession of the entire quarter section, while the defendant Driscoll has the decision of the land department, entered since the trial of this case, awarding him the patent, and consequent right to possession of the same premises.

We have no doubt that the manifest intent of the statutes of the United States, as is so clearly expressed by the decisions of the supreme court, was to vest in the land department an exclusive jurisdiction of all questions relating to the sale and

disposition of the public lands up to the time of the issue of the patent; and this court is therefore of the opinion that the distric court erred in entering judgment upon such verdict for the possession of the entire quarter section, ousting the defendant Driscoll from his possession and improvements made upon the vacant and unimproved portions of the land. It is not meant to be understood by this decision that an action for possession does not lie under section 650 of the Code of Civil Procedure to protect the actual possession of the pre-emptor against an intruder, or that such action might not lie to recover, beyond the actual possession, the entire quarter section as against a trespasser. This court contents itself with declaring that the judgment ousting the junior pre-emptor from his possession and improvements, obtained and made without trespass, is erroneous, and must be reversed.

In the view the court has taken of this case, it is not deemed necessary to notice the alleged errors of the court in its charge to the jury upon the question of abandonment, or to pass upon the other errors assigned.

The judgment is reversed. All the justices concurring.